[No. G008181. Fourth Dist., Div. Three. June 13, 1990.]

ALAMO RENT-A-CAR, INC., Plaintiff and Respondent, v.
BOARD OF SUPERVISORS OF ORANGE COUNTY et al.,
Defendants and Appellants.

**COUNSEL**

Adrian Kuyper, County Counsel, Edward N. Duran, Daniel J. Didier and Robert Austin, Deputy County Counsel, for Defendants and Appellants.

John R. Calhoun, City Attorney (Long Beach), Roger P. Freeman, Deputy City Attorney, James K. Hahn, City Attorney (Los Angeles), Gary R. Netzer, Assistant City Attorney, Louise H. Renne, City Attorney (San Francisco), Donald J. Garibaldi, Deputy City Attorney, William J. Adams, City Attorney (Palm Springs), McDermott, Will & Emery, Richard K. Simon and Lee K. Blackman as Amici Curiae on behalf of Defendants and Appellants.

Wyman, Bautzer, Kuchel & Silbert, H. Warren Siegel and Christina Snyder for Plaintiff and Respondent.

**OPINION**

**SONENSHINE, J.**—The Board of Supervisors of Orange County (the Board) appeals a judgment invalidating its resolution No. 88-1604 which sought to impose a fee, based on gross receipts, for operation of rental car agencies located off the premises but serving the passengers of John Wayne Airport (the Airport). The Board contends its action was properly taken pursuant to its authority to operate and maintain the Airport facilities.

I

Five of the rental car agencies servicing arriving and departing passengers at the Airport are located on Airport property, maintaining counter, office, and limited "ready-car" parking space on the site. These agencies obtained their positions through competitive bidding and are accordingly assessed 10 percent of their gross receipts. The agencies unable to operate within the terminal are headquartered on sites not associated with the Airport, meeting their customers' needs through the use of shuttle buses to and from the Airport.

In late 1988, the Board imposed an off-airport rental car fee, assessing each impacted agency 9 percent of its gross receipts. In January 1989, Alamo Rent-A-Car, Inc., opened its off-site business pursuant to the fees imposed. In March, it filed a petition for writ of mandate and declaratory and injunctive relief, challenging the Board's action. In particular, Alamo alleged the charges were violative of Proposition 13 (Cal. Const., art. XIII

A, § 4),[1] which requires an electoral vote for imposition of any "special tax" not qualifying as a "user fee" under Government Code section 50076.[2]

The Board claimed the fee was properly imposed pursuant to sections 50474 and 26360,[3] which authorize the operation and maintenance of the Airport and specifically allow charges for using the facilities. The resolution at issue recited the county policy of assuring the Airport would always be self-supporting, without requiring "the expenditure of local tax funds, which policies require that the costs and expenses for specialized facilities be paid by the users of such facilities who enjoy the commercial opportunities that such facilities create and that such users also pay fees for such opportunities appropriate to and commensurate with the type and volume of business potential under leases, concessions agreements, or permits. . . ."[4]

The resolution iterated the necessity of retiring construction debts, paying for equipment, providing for the public's safety and welfare, and enhancing the use of the public transportation facility; to this end, "it is necessary to fix charges and fees for those persons and corporations who do not have leases or construction agreements . . . including off-airport rental

---

[1] Future references to article XIII A are to the California Constitution.

Section 4 of article XIII A provides: "Cities, counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

[2] Future statutory references are to the Government Code unless otherwise designated.

Section 50075 implements the constitutional provision: "It is the intent of the Legislature to provide all cities, counties, and districts with the authority to impose special taxes, pursuant to the provisions of Article XIII A of the California Constitution." Section 50076 provides: "As used in this article, 'special tax' shall not include any fee which does not exceed the reasonable cost of providing the service or regulatory activity for which the fee is charged and which is not levied for general revenue purposes."

[3] Section 50474, enacted in 1949, provides, in pertinent part: "In connection with the erection or maintenance of such airports or facilities, a local agency may: [¶] [¶] (b) Exact charges, fees, and tolls, and enforce liens for their payment. . . ."

Section 26360 provides, in pertinent part: "The board shall fix the rental rates, fees and all other charges to be made for all facilities furnished, acquired, constructed or completed under this chapter [bonds for county improvement] for the use thereof by any persons utilizing such facilities. . . ."

[4] Under federal law, the Airport must maintain a fee and rental process which will render the Airport self-sustaining. (49 U.S.C. § 2210(a)(9).) The debt service documents contain similar language. The county may not use its general funds to subsidize operation of the Airport.

This policy is mirrored in the Orange County Code, section 2-1-40: The Board will "operate the airport on an enterprise basis at no cost to the local taxpayer through the imposition of fair and reasonable fees and charges . . . ." Pursuant to the code, off-site car rental companies must obtain a permit to operate; the permit "*shall* require the off-airport rental agency to pay a fee, as established by resolution of Board of Supervisors . . . ." (*Id.*, § 2-1-44, italics added.)

car companies who want the privilege of picking up passengers and supplying services to passengers . . . ." Due to increased traffic volume at the Airport, expansion and improvement is necessary, particularly in "the operation, maintenance and control of the terminal roadways, curbs, and drop-off/pick-up areas, for the firms who use the facilities including off-airport rental car companies . . . ."

The proposed fees, "not levied for general revenue purposes," were set at "nine percent (9%) of gross receipts derived from the rental of automobiles to passengers of John Wayne Airport" for off-site rental car companies so they would "contribute to the cost of the Airport to an extent commensurate with the value of the privileges they enjoy or the facilities they use . . . ." The Board stated the fees "are reasonable compensation from the users . . . for the use of Airport facilities and are needed to help defray the cost of operating, maintaining, and developing the Airport . . . ." Off-airport concessionaire fees were already imposed on "passenger stage carriers, taxicabs and airline food providers" and were contemplated in the future for "hotel-motel and charter party carriers."

The trial court granted the writ: "The fee imposed by resolution 88-1604 does not qualify as a user fee under Government Code section 50076, and is therefore a tax violative of Article XIII of the California Constitution. The fee was imposed for general revenue purposes, and it did not appear that the fee bore a relationship to the reasonable cost of providing the service, i.e., access of Alamo to airport roads. Therefore, the resolution is invalid and of no effect."

By motion for reconsideration and on appeal, the Board argues the Alamo fee was not a "special tax" within the purview of article XIII A; section 50076 is inapplicable for that reason; and the fee itself was reasonable and sufficiently related to the benefit derived by Alamo. Amici curiae join with and supplement the argument of the Board.

## II

The Board contends the fees imposed on Alamo are not subject to the restrictions of article XIII A; the charges do not constitute a tax, "but a fee upon off-airport rental car operators for the privilege of operating a concession at the Airport from which they share commercial advantage and profit."

We begin with the proposition "the language of section 4 must be strictly construed and ambiguities therein resolved so as to limit the measures to which the two-thirds requirement applies." (*City and County of San*

*Francisco* v. *Farrell* (1982) 32 Cal.3d 47, 52 [184 Cal.Rptr. 713, 648 P.2d 935].) ■ "[A] special tax 'levies a fee to replace revenue for services which were affected by the reduction [in taxes] caused by article XIII A." (*California Bldg. Industry Assn.* v. *Governing Bd.* (1988) 206 Cal.App.3d 212, 236 [253 Cal.Rptr. 497].)

The Board, as operator and proprietor of the Airport, was to operate the facility without cost to the local taxpayers by imposing "fair and reasonable rentals, fees and charges . . . ." Nevertheless, in its designated role the Board, like the transportation commission in *Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197 [182 Cal.Rptr. 324, 643 P.2d 941], was not "authorized to levy a property tax." (*Id.*, at p. 199.)[5] In *Richmond,* a sales tax was imposed, upon a majority voter approval, by the commission. The director refused to impose the tax, on the advice of the Attorney General, because the measure had not received the two-thirds vote allegedly required by article XIII A, section 4.

The *Richmond* court found "the tax was validly adopted . . . because LACTC is not a 'special district' within the meaning of section 4. . . . [T]he goal of article XIII A is real property tax relief, and a governmental body like LACTC, which does not have the power to levy a property tax, is not the type of 'special district' governed by the section." (31 Cal.3d at p. 201.) **(1b)** Here, while the county is empowered to levy property taxes, the Board was specially appointed to operate the Airport, and, in that capacity, limited in the methods it might use to finance its operations.

In *Russ Bldg. Partnership* v. *City and County of San Francisco* (1987) 199 Cal.App.3d 1496 [246 Cal.Rptr. 21], certain developers challenged an ordinance conditioning the issuance of a building permit upon payment of a transit fee "to offset the anticipated increased costs to accommodate the new riders during peak commute hours . . . ." (*Id.*, at p. 1503.) The developer contended the fees were a "special tax" subject to article XIII A because they exceeded the reasonable cost of the increased services. However, the transit fee in *Russ Bldg.,* like the fee imposed on Alamo, was "not intended to replace revenues lost as a result of article XIII A." (*Id.*, at p. 1505.) Rather, it was triggered by the developer's *voluntary decision* to build. "None of the transit fees are earmarked for general revenue purposes. Further, unlike most taxes, the fees imposed . . . are not compulsory but are exacted only if the developer voluntarily chooses to create new office space." (*Ibid.*)

In *California Bldg. Industry Assn.* v. *Governing Bd., supra,* 206 Cal.App.3d 212, certain school districts submitted a proposed tax on devel-

---

[5]The only authorization for taxes concerned the original acquisition of the land. (Gov. Code, § 50473.)

opers for school capital expenditures to the voters and received passage by a *two-thirds vote.* In reversing the trial court's validation of the alleged "special tax," the reviewing court observed the districts merely sought to "impose what are, in actuality, development fees." (*Id.*, at p. 233.) By this attempted expedient, they could circumvent the limitations on development fees imposed by section 65995. In differentiating between special taxes and fees, the court stated, "Whereas taxes are compulsory in nature, development fees are imposed only if a developer elects to develop." (*Id.*, at pp. 235-236.)

Moreover, the two-thirds vote requirement of article XIII A was a safeguard for the *electorate* —"voters are often not willing to impose taxes *on themselves.* Here, in an unsurprising result, the voters gladly imposed 'taxes' which the developers alone would have to pay. This was directly at odds with the purpose and intent of section 4's supermajority requirement." (*California Bldg. Industry Assn.* v. *Governing Board, supra*, 206 Cal.App.3d at pp. 236-237.) Special taxes must be imposed "on such district" which precludes "taxes which the electorate impose on others and not directly or indirectly on themselves . . . ." (*Id.* at p. 237.) The proposed charge was not a tax at all.

Alamo cites *Bixel Associates* v. *City of Los Angeles* (1989) 216 Cal.App.3d 1208 [265 Cal.Rptr. 347], where a fire hydrant fee was overturned for failure of the city to meet its burden of showing the method of determining the amount of the fee was a fair and reasonable approximation of the benefit to the developer challenging the fee. Based thereon, Alamo insists the present access fee must be invalidated and the Board required to perform an appropriate cost benefit analysis as a precondition to enactment of any future access fees. The fees in *Bixby*, preconditions of issuance of a building permit and earmarked for fire protection services, were specifically governed by the implementing legislation of section 54990 et seq., which provides that if particular fees exceed a reasonable rate for the services, a two-thirds vote of the electorate is necessary. However, "[t]he referenced sections—54990 et seq.—apply *generally* to all local zoning, permit, and water and sewer connection fees, and establish, inter alia, a procedure which local entities must follow in levying new or increased fees." (*Sea & Sage Audubon Society, Inc.* v. *Planning Com.* (1983) 34 Cal.3d 412, 421, fn. 4 [194 Cal.Rptr. 357, 668 P.2d 664], italics added.) These are matters for the benefit of and affecting all constituents; they relate to general municipal functions.

Here, the fee cannot be treated as a special tax within the context of article XIII A. It was included in the policy considerations adopted when the Board was appointed to operate the Airport, and is merely an author-

ized fee "normally enacted by local governing bodies themselves, not by the voters." (*California Bldg. Industry Assn.* v. *Governing Bd., supra,* 206 Cal.App.3d 212, 233.) The authorities cited by Alamo generally address countywide services impacted by the activities of a particular plaintiff. (*Bixel Associates* v. *City of Los Angeles, supra,* 216 Cal.App.3d 1208 [fire protection]; *Russ Bldg. Partnership* v. *City and County of San Francisco, supra,* 199 Cal.App.3d 1496 [transportation]; *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist.* (1985) 165 Cal.App.3d 227 [211 Cal.Rptr. 567] [water district];[6] *J. W. Jones Companies* v. *City of San Diego* (1984) 157 Cal.App.3d 745 [203 Cal.Rptr. 580] [public works in general, including water, schools and police protection].) Here, we deal with an insular proprietary activity—operation of the Airport.

The Airport had to be self-sustaining, accomplished through rentals, fees and charges levied against commercial users of the facilities, and *at no cost to the local taxpayers.* No property or other taxes were envisioned or authorized (except for the original acquisition of the land). The Alamo fees were not imposed to replace monies lost after enactment of article XIII A. The assessment was not compulsory; Alamo is only subject to the fee if it elects to do business at the Airport. And prior submission of the proposed fee to the voters for approval would be nonsensical. It would have little impact on those voters. In fact, the fee imposed on Alamo appears to be excluded by the very language of article XIII A: "a *two-thirds vote of* the qualified electors of *such district,* may impose special taxes *on such district* . . . ." (Italics added.) Under the circumstances of this case, the charge must be treated as a fee for specific entities which choose to operate on, and derive financial benefit from, the Airport, a self-financing activity. This fee is not a special tax within the meaning of article XIII A.

### III

We have concluded the trial court erred in finding the access fee was a tax in violation of article XIII A. We note the court reached its decision by

---

[6] Alamo relies heavily on *Beaumont Investors,* where a facilities fee charged for hookup to the water system was found to be a "special tax" because it exceeded the reasonable costs of constructing the contemplated improvements for which the fee was imposed. The court stated the district must show "evidence of (1) the estimated construction costs of the proposed water system improvements, and (2) the District's basis for determining the amount of the fee allocated to plaintiff, i.e., the manner in which defendant apportioned the contemplated construction costs among the new users, such that the charge allocated to plaintiff bore a fair or reasonable relation to plaintiff's burden on, and benefits from, the system." (*Id.,* at pp. 234-235.) Because there was *no* evidence in the record, the *Beaumont* court was unable to determine whether the fees were reasonable. The court stated, "Therefore, we must hold that the facilities fee constitutes a 'special tax' within the meaning of Proposition 13 . . . ." (*Id.,* at p. 238.) However, the *Beaumont* parties *agreed* the fee was within the ambit of section 50076 if it was determined to be reasonable. (*Id.,* at p. 234.)

"reverse logic," i.e., if the fee did not meet the requirements of section 50076, then it must be a special tax. That is not the proper approach in this case. If the fee is not the type of exaction which article XIII A was designed to reach, then resort to sections 50075-50077, the enabling legislation for the article, is unnecessary.

In other words, the fee need not, as the trial court felt necessary, be "reasonable" in the section 50076 sense of bearing a direct "relationship to the reasonable cost of providing the service, i.e., access of Alamo to airport roads." However, that is not to say there is no standard for review of fees imposed by the Board in this instance. Although not subject to the restrictions of article XIII A in determining the fees to be allocated to commercial entities which use the Airport for economic benefit, the Board may not act arbitrarily.[7] In particular, it is only authorized, pursuant to the county code, to maintain the Airport "through the imposition of *fair and reasonable* rentals, fees and charges." (Italics added.) This, then, is the standard which the court should have utilized. Does "fair and reasonable," however, relate to Alamo's physical use of the facilities or to the profit it reaps from the Airport passengers?

Other state courts have been called upon to address charges imposed on off-airport businesses. In *Airline Car Rental* v. *Shreveport Airport Authority* (W.D.La. 1987) 667 F.Supp. 303, an Avis licensee objected to a 7 percent fee imposed on nontenant rental car businesses by resolution of the airport authority. The resolution stated its purpose was to retire construction debts, pay for operation and maintenance of the airport and generally protect the health and welfare of the traveling public. The court upheld the summary judgment granted to the airport authority against the licensee's claims that the enabling resolution was "in violation of state and federal Equal Protection Clauses, in violation of state and federal anti-trust laws, and without lawful authority." (*Id.*, at p. 305.) The court sanctioned the authority's desire to protect the revenue derived from the on-airport rental companies, i.e., imposing fees on off-site companies "would discourage current tenant rental car businesses from transferring their operations to off-premises locations." (*Id.*, at p. 309.) Thus, raising additional revenue for maintenance and operation is important, but of necessity the airport authority must consider "protection of a significant and *established* source of revenue used to operate and maintain the airport." (*Id.*, at p. 312, italics added.)

The *Airline* court found the gross receipts fee reasonable, explaining and adopting the reasoning in *Toye Bros. Yellow Cab Company* v. *Irby* (5th Cir.

---

[7]The justification for the fees imposed on Alamo and the method by which the Board reached the stated percentage appear in an appendix following this opinion.

1971) 437 F.2d 806. In *Toye Bros.,* a 10 percent of gross receipts fee was assessed against a ground transportation provider. There, as here, the parties agreed "the Board is entitled to a reasonable fee for the use of the facilities provided at the Airport." (*Id.,* at p. 811.) "The issue is to determine what is a reasonable fee, and how that fee may be computed. . . . But in the instant case the charge levied is not a tax in the traditional sense. It is rather compensation for use of the Airport facilities." (*Ibid.*) And there was evidence, inter alia, that "10% of the gross receipts is a *commonly-accepted charge throughout the nation* for use of Airport facilities." (*Ibid.,* italics added.)

Alamo's insistence that the Board failed to make a meaningful distinction between the advantages of on-site and off-site operations is akin to the equal protection challenge mounted by a different franchisee in *Alamo Rent-A-Car* v. *Sarasota-Manatee Airport Auth.* (11th Cir. 1987) 825 F.2d 367, certiorari denied 484 U.S. 1063 [98 L.Ed.2d 987, 108 S.Ct. 1022]. The facts are strikingly similar. Sarasota, by resolution, established a user fee for off-airport car rental companies: "'10% of all gross business receipts derived from the rental of automobiles to passengers picked up at the Airport . . . .'" (*Id.,* at p. 369.) There, too, the fee was justified as a means of recouping revenue lost because of the competition with on-airport companies, eliminating any incentive for on-airport rental car companies to leave the airport. Additionally, the fee was patterned after a fee schedule adopted in Missouri and upheld by the Missouri courts. And "the Authority sought to maximize its revenues by charging the off-airport companies a fee based upon the *benefits* they receive from use of the airport." (*Id.,* at p. 373, italics added.)

The *Alamo* court noted that the off-airport fees would vary according to the number of patrons actually picked up at the airport and who rent cars: "On-airport car rental companies, on the other hand, must pay ten percent of the revenues they receive from *all* customers." (*Alamo Rent-A-Car* v. *Sarasota-Manatee Airport Auth., supra,* 825 F.2d 367, 373.) And on-site companies obtained their positions through competitive bidding, in which the plaintiff could have joined; it was "free to enter the bidding process and perhaps displace one of those companies." (*Ibid.*) The *Alamo* court concluded the fee was fair and reasonable.

We are convinced the fees need not relate only to use of the airport roads and shuttle stops, but may apply to general airport maintenance and operational costs. They are not levied merely to cover the costs of a service *enlarged* because of the presence of Alamo. Rather, construction and maintenance of the Airport was undertaken for airline *passengers,* who in turn are the customers for both on- and off-site rental car companies. Alamo is

but one of the businesses which flock to the area, desiring to pluck a portion of the existing commuter market arising from the Airport's already established facility. The added burden Alamo places on the Airport includes, of course, the element of increased traffic from Alamo's shuttle buses and the need for a pickup/dropoff area. The benefit Alamo receives, however, flows from all phases of the Airport operation.

Fees assessed against off-premises rental car companies, therefore, may, and should, be comprised of a "fair and reasonable" approximation of the overall commercial benefit each derives from its exploitation of the presence of the Airport. By definition, an "approximation" cannot be an exact correlation. For this reason, a percentage of gross receipts, which attaches only to income generated by those airline passengers who are collected at the Airport and then rent a car, is an acceptable and uniform method of relating the access fee to the volume of business derived from the presence of the Airport.

Whether the percentage adopted by the Board is itself "fair and reasonable" will depend upon consideration of the necessity for (1) the Airport to remain self-supporting, safeguard its existing revenues, recoup lost revenue, and deter the transfer of on-site companies, and (2) Alamo to pay its fair share toward the general operation of the facility upon which it relies for its livelihood, but recognizing the disadvantages of an off-site location, as well as Alamo's right to bid for an on-site location if it so desires.

Judgment reversed. The matter is remanded to the trial court for a determination of whether, in accord with the views expressed in this opinion, the access fees assessed by the Board against off-site rental car companies are "fair and reasonable."

Crosby, Acting P. J., and Moore, J., concurred.

Respondent's petition for review by the Supreme Court was denied August 22, 1990.

APPENDIX

The basis for the off-site rental car company fees is related in the reports of the Airport's manager and its fiscal officer. The reports note both on- and off-site agencies "draw from the same customer base provided by the Airport." Yet, while competing with on-site companies for a share of the market and deriving "economic benefit and profit from operating on and from the Airport," the off-airport companies do not contribute to the operation of the facility upon which they rely. "Justification" for the fees, based on statutory authorization, was the Board's mandate to operate the Airport at no cost to local taxpayers and, at the same time, make the Airport self-sustaining. Also of concern was the preservation of present revenues from on-site companies, i.e., "to eliminate any incentive an on-airport operator may have to leave the Airport if off-airport operators are not charged a fee, or if such fee is only nominal."

Further reason for the fee was to "increase Airport administration's ability to regulate Airport roadways and to manage its facilities for the benefit of all passengers." Present overcrowding and anticipated future expansion were stressed and delineated in detail.

The proposed percentage of gross receipts suggested was "patterned after similar fee structures for off-airport rental cars . . . upheld in other jurisdictions."* In particular, the report cited Louisiana, Florida, and Pennsylvania cases finding comparable fee structures did not violate "antitrust laws, the commerce clause, equal protection, due process of law, and tortious interference with business." A federal aviation report, finding no need to prohibit a gross receipts charge to off-airport companies, was included.

Present charges levied against other off-airport-based companies were listed, including "passenger stage services (larger buses) [which] pay a percentage fee (10% of gross receipts), subject to a monthly minimum . . . . Other off-airport service providers, such as hotel-motel shuttles and charter party carriers (van services, and limousines) will be subject to further study as to concession fees in the future."

The report then related the charges (10 percent of gross receipts) to on-airport operators and stated: "This charge includes counter space and office area, and a slightly reduced rate for ready-car parking." The calculated value of the latter facilities was approximately $142,080, and the annual guarantee from on-airport companies was anticipated to be $3,457,579. Deducting the value of on-site space, the report notes a net percentage paid of 9.59% of total gross receipts. That rate was then rounded down to 9%, "to allow for variations in costs to operators, as well as intangible items such as exposure to the public," to arrive at the percentage to be charged to off-site companies. The on-site car rental companies are presently located outside the terminal in modular buildings. The advertising, however, which announces the availability of all rental companies, is inside the terminal. The Airport's manager stated this advertising "is independently purchased from the airport advertising concessionaire or on the hotel-motel telephone board. This advertising space can be purchased by the off-airport operators, as well as on-airport."

---

* "The following airports impose percentage fees on off-airport rent-a-car companies:

|  | Off-Airport | On-Airport |
|---|---|---|
| "Palm Beach International, FL | 8% | 10% |
| "Sarasota, FL | 10% | 10% |
| "Gulfport Biloxi, MS | 7% | 10% |
| "Shreveport, LA | 7% | 10% |
| "Memphis, TN | 8% | 8% |
| "Savannah International, GA | 8% | 10% |
| "Gainesville, FL | 10% | 10% |
| "Jackson, MS | 7% | 10% |
| "Lake Charles, LA | 8% | 10%" |