[No. B030733. Second Dist., Div. Three. Nov. 29, 1988.]

CALIFORNIA BUILDING INDUSTRY ASSOCIATION et al., Plaintiffs and Appellants, v.

GOVERNING BOARD OF THE NEWHALL SCHOOL DISTRICT OF LOS ANGELES COUNTY, et al., Defendants and Respondents.

214

COUNSEL

Nossaman, Guthner, Knox & Elliott, Alvin S. Kaufer and Winfield D. Wilson for Plaintiffs and Appellants.

Bion M. Gregory, Jack I. Horton, James L. Ashford, Daniel A. Weitzman, Ronald A. Zumbrun, Anthony T. Caso and Sharon L. Browne as Amici Curiae on behalf of Plaintiffs and Appellants.

Bowie, Arneson, Kadi & Dixon, Terry E. Dixon, Carol J. Graham, Parker & Covert, Clayton H. Parker, Charles S. Scolastico and Michelle D. English for Defendants and Respondents.

Burke, Williams & Sorensen, Carl K. Newton, Timothy B. McOsker and Karen M. Steentofte as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**CROSKEY, J.**—California Building Industry Association and the Building Industry Association of Southern California, Inc. (Building Industry) appeal from a judgment denying their petition for a writ of mandate against the Governing Board of the Newhall School District of Los Angeles County (Newhall), the Board of Trustees of the Saugus Union School District of Los Angeles County (Saugus), the Board of Trustees of the Castaic Union School District of Los Angeles County (Castaic), the Board of Trustees of the William S. Hart Union High School District of Los Angeles County (Hart), and the Board of Trustees of the Sulpher Springs Union School District of Los Angeles County (Sulpher Springs). (Hereinafter, the respondents are referred to collectively as school districts).[1]

By this appeal we are asked to determine (1) whether certain exactions imposed by the school districts on developers of new residential housing within the respective districts are valid as special taxes under section 4 of article XIII A of the California Constitution or, if not, (2) whether such exactions can otherwise be sustained as development fees.

We conclude the exactions are invalid and cannot stand either as special taxes or development fees. First, absent enabling legislation, the school districts had no constitutional authority to impose special taxes. Such authority was not granted by article XIII A, section 4 and the special taxes imposed have not been authorized by the Legislature. Second, what the school districts sought to impose as special taxes were not taxes at all, but were actually in the nature of development fees. The characterization of these exactions as special taxes, and their submission to voters who would not be called upon to pay them, was a poorly disguised and ineffectual attempt to avoid the statutory limitations to which development fees are subject. Third, the exactions were imposed not on an electorate which, unsurprisingly, voted overwhelmingly to approve them, but rather solely on the developers of new residential projects. Thus, these special taxes were not imposed "on such district" as required by article XIII A, section 4. Finally,

---

[1] On September 16, 1987, we denied Building Industry's petition in this court for a writ of mandate on the ground review by appeal was an adequate remedy.

the Legislature has enacted strict financial limitations on the imposition of development fees by school districts and to the extent the exactions imposed exceed such limits, they cannot be sustained as development fees.

### FACTUAL BACKGROUND

The essential facts are undisputed. In June 1978, California voters adopted Proposition 13, an initiative measure which amended the state Constitution by adding article XIII A (article XIII A).[2] ■ The general purpose of Proposition 13 (to avoid confusion, all further references to Prop. 13 shall be to article XIII A) was to afford tax relief to California real property owners by imposing (1) limitations upon the tax rate applicable to real property, (2) restrictions on the valuation and assessment of real property, (3) stricter voting requirements for any change by the Legislature in tax rates or methods of computation and (4) elimination of the right of the state and local entities (i.e., cities, counties, and special districts) to impose ad valorem taxes on real property or transaction or sales taxes on the sale of real property. (See *Amador Valley Joint Union High Sch. Dist.* v. *State Bd.*

---

[2] Article XIII A, provides, in pertinent part, as follows: "Section 1. (a) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property. The one percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties.

"(b) The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on (1) any indebtedness approved by the voters prior to July 1, 1978, or (2) any bonded indebtedness for the acquisition or improvement of real property approved on or after July 1, 1978, by two-thirds of the votes cast by the voters voting on the proposition.

"Sec. 2. (a) The full cash value means the county assessor's valuation of real property as shown on the 1975-76 tax bill under 'full cash value' or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment. All real property not already assessed up to the 1975-76 full cash value may be reassessed to reflect that valuation. . . .

". . . . . . . . . . . . . . . . . .

"(b) The full cash value base may reflect from year to year the inflationary rate not to exceed 2 percent for any given year or reduction as shown in the consumer price index or comparable data for the area under taxing jurisdiction, or may be reduced to reflect substantial damage, destruction or other factors causing a decline in value.

". . . . . . . . . . . . . . . . . .

"Sec. 3. From and after the effective date of this article, any changes in State taxes enacted for the purpose of increasing revenues collected pursuant thereto whether by increased rates or changes in methods of computation must be imposed by an Act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature, except that no new ad valorem taxes on real property, or sales or transaction taxes on the sales of real property may be imposed.

"Sec. 4. Cities, counties and *special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district,* except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district." (Italics added.)

*of Equalization* (1978) 22 Cal.3d 208, 220 [149 Cal.Rptr. 239, 583 P.2d 1281].)

Another purpose of article XIII A, and the one most relevant here, was to restrict the right of local entities to raise revenue by means of special taxes. Section 4 of article XIII A provides that such taxes must be approved by a *two-thirds* vote of the qualified voters of the local entity. (*Id.,* at p. 220.)

In 1987 each school district adopted a resolution to submit to their respective district voters the question of whether a special tax should be levied and collected to provide funds for capital outlay purposes, including construction, acquisition and leasing of new school facilities. Section 4 of article XIII A was cited as the authority for the imposition of such taxes through the election process. It is these special taxes which are the subject of the instant action.

The Hart, Castaic, Saugus, and Newhall resolutions set forth the following reasons for imposition of the special tax (which they characterized as a School Facilities Development Tax): (1) increased residential development within the respective districts which caused overcrowding of existing school facilities, (2) inability of existing facilities to adequately serve the estimated increased number of students expected from approved and future residential projects and (3) insufficient funding available for construction, acquisition and leasing of required school facilities. The reason given for the special tax in the Sulpher Springs resolution was the need for new school facilities to accommodate the influx of students generated by such development.[3]

---

[3] Hart resolved to levy a "School Facilities Development Tax" upon "all persons receiving building permits within the District at a rate up to but not exceeding [$3,439] per dwelling unit for dwelling units which are also within the [Newhall, Saugus or Sulphur Springs districts] and at a rate up to but not exceeding [$2,418] per dwelling unit for dwelling units which are also within the [Castaic district]." The tax was to be levied annually, beginning on June 3, 1987, and was to be adjusted annually on April 15 to reflect adjustments in the Consumer Price Index.

Castaic, Saugus, and Newhall also resolved to levy "School Facilities Development Taxes" with respect to dwelling units in their respective districts identical to the Hart tax except for the amount. The Castaic rate was not to exceed $3,783 per dwelling unit. The Saugus rate was not to exceed $2,861 per dwelling unit, and the Newhall rate was not to exceed $2,542 per dwelling unit.

Sulpher Springs resolved to impose a special tax at the rate of $2,000 per dwelling unit with respect to new residential construction in the district, which tax would be adjusted annually on December 1 of each year to reflect changes in the Consumer Price Index. If there were "necessary school facilities available to accommodate students expected to reside in dwelling units in those residential developments," then no tax would be payable in such instance.

In all five districts, persons receiving building permits for senior citizen housing or for dwelling units with one bedroom or less were exempted from the tax.

On June 2, 1987, the special taxes referred to above were adopted by a two-thirds vote of the "qualified electors" of the respective Hart, Castaic, Saugus, Newhall, and Sulpher Springs districts.[4]

Besides their resolutions for the school facilities development *taxes,* each school district also adopted a resolution providing for the levying of school facilities development *fees* under Government Code section 53080.[5] A credit against the special taxes approved by the voters was to be allowed in an amount equal to all such development fees paid to the school districts pursuant to section 53080.[6]

## PROCEDURAL HISTORY

On June 23, 1987, Building Industry filed a complaint for declaratory and injunctive relief challenging the validity of the special taxes, as well as a petition for a writ of mandate (Code Civ. Proc., § 1085) to compel school districts to authorize issuance of building permits without first requiring payment of the challenged exactions. On or about August 6, 1987, Hart, Castaic, Saugus, and Newhall jointly answered and denied the material allegations in the petition and complaint. On the same date, Sulpher Springs filed separately a similar answer.

Following a hearing on August 20, 1987, the petition was denied.[7] The judgment denying a peremptory writ of mandate was filed September 17,

---

[4] In each of the five school districts it is clear that the special taxes were *not* imposed upon all persons, or property owners or parcels of real property, but rather *only* upon *new* units of residential development. In fact, the voter pamphlet material, as well as the proponents' advertising soliciting a "yes" vote, repeatedly emphasized that existing residents would not be assessed or required to pay the special taxes.

[5] All future section references are to the Government Code unless otherwise indicated.

[6] The Superintendents of the Hart, Castaic, Saugus, and Newhall school districts each filed declarations with the trial court in opposition to Building Industry's petition. In their respective declarations they stated that *the subject special taxes were necessary to supplement the school facilities development fees which the districts adopted for capital outlay for school facilities.* They stated that the development fees would pay only approximately 40% of the money needed for capital outlay to accommodate the students which would be generated by new residential development. In a resolution adopted June 3, 1987, Sulpher Springs expressly found that the "$2,000 per residential dwelling unit [special tax] *in addition to other fees payable to the District* will be sufficient to provide adequate school facilities to accommodate students expected to reside in dwelling units created by new development." (Italics added.)

[7] The trial court denied the writ of mandate for the following reasons: "a. Article XIII A Section 4 of the California Constitution is self executing in its authorization to the voters of each of the school districts to impose the special tax inovlved [sic] herein by a 2/3 vote. Because of the fact that Article XIII A Section 4 is self executing a separate statute specifically authorizing the district to impose a special tax is not necessary.

"b. The 1986 Legislation contained in Government Code 53080 and 65995 does not preclude the voters of a school district by a 2/3 vote from establishing a tax on the construction

1987.[8] The Building Industry appeals from that judgment.[9] The position of each of the parties has generated extensive amicus support.[10]

## SUMMARY OF RELEVANT LEGISLATIVE AND INITIATIVE HISTORY

Before discussing the specific issues raised by the parties and amici, it is useful to review the context in which article XIII A was presented to the voters and the subsequent legislative and initiative activity which it generated.

Section 4 of article XIII A states that cities, counties and special districts, by a two-thirds approval of the voters, may impose special taxes so long as those taxes are not ad valorem taxes on real property or transaction or sales taxes on the sale of real property. The State of California submitted to the voters written information relative to state ballot measures in the June 1978 election, including information for article XIII A. The analysis which was provided specifically stated: "The Legislative Counsel advises us that provi-

---

of dwelling units within each school district to provide funds with which to construct school facilities required by the increase in population caused by the increase in dwelling units construction and sale.

"c. This is a tax, not a fee, although covering the same activity as the developers' fee. The cases which validated the fees to cover the cost of services do not preclude a special tax. They merely find a basis for validating the fee. The fee does not preempt the tax imposed by 2/3 of the electorate.

"d. The special tax measures do not violate the equal protection clauses of the Constitution in that there is rational basis for imposing the tax on the builders of the new residential units and the taxes do not violate the *Serrano* v. *Priest* decisions in that they would not result in disparity between districts based on wealth."

[8] In addition, on September 16, 1987, the complaint for injunctive and declaratory relief was dismissed without prejudice.

[9] The judgment based on the denial of a petition for a writ of mandate is appealable. (Code Civ. Proc., § 904.1, subd. (a).)

[10] The Assembly of the State of California has filed an amicus curiae brief expressing the view that prior legislative authority for the imposition of any "special tax" is required. By a letter filed August 4, 1988, the Senate of the State of California has joined in that amicus brief. The City of Santa Clarita filed two amicus curiae briefs in support of the school districts and argued that (1) section 4 of article XIII A is self-executing, (2) the subject exactions are special taxes under that section, and (3) imposition of those taxes do not violate the equal protection guarantee of the Constitution. In its amicus brief the Schools Legal Defense Association also supported the school districts' position that section 4 of article XIII A is self-executing and thus enabling legislation was not required before the special taxes could be imposed. In their amicus brief, Paul Gann and the Pacific Legal Foundation argued that (1) taxes imposed under article XIII A, section 4 must be preauthorized by the Legislature and that no such authorization exists for the exactions challenged in this case, (2) school districts' "taxes" violate constitutional provisions against the taking of private property, (3) statutory provisions provide a limitation on the amount school districts can levy as development fees and (4) the taxes infringe on the right to travel by economically impacting the ability of people to move into the school districts.

sions in the existing Constitution *would prohibit* general law cities, counties, *school districts*[11] *and special districts from imposing new 'special taxes' without specific approval by the Legislature. Such restrictions limit the ability of these local governments, even with local voter approval, to replace property tax losses resulting from the adoption of this initiative.*" (Ballot Pamp. Proposed Amends. to Cal. Const. with arguments to voters, Primary Elec. (June 6, 1978) pp. 57, 60, italics added.)

Following voter approval of article XIII A, the Legislature moved promptly to provide such statutory authority. Section 50075 et seq., was added to the Government Code in 1979. (Stats. 1979, ch. 903, § 1, p. 3112, eff. Sept. 22, 1979.) As amended in 1980 (Stats. 1980, ch. 672, § 1, p. 1866, eff. July 20, 1980), section 50075 reads: "It is the intent of the Legislature to provide all cities, counties, *and districts* with the authority to impose special taxes, pursuant to the provisions of Article XIII A of the California Constitution."[12] (Italics added.)

Apparently unhappy with what they viewed as legislative efforts to dilute the effect of article XIII A, its backers submitted another initiative proposal, Proposition 62. On November 4, 1986, that measure was approved by California voters. It added eleven sections to the Government Code (commencing with § 53720), all directed to the issue of taxation by local governments and districts. Section 53721 defines "general taxes" as "taxes imposed for general governmental purposes" and "special taxes" as "taxes imposed for specific purposes."

---

[11] The reference by Legislative Counsel to "school districts," as separate and distinct from "special districts," raises a question as to whether the latter term embraces the former. Our review of the applicable authorities strongly suggests to us that the terms "special district" and "district," as used in article XIII A and related legislation, do not include the school districts. (See *Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197, 205-206 [182 Cal.Rptr. 324, 643 P.2d 941]; Cal. Const., art. XIII, § 21 [formerly art. IX, § 6 (¶ 6)]; *McDonald* v. *Richards* (1926) 79 Cal.App. 1, 8-10 [248 P. 1049] [discussing the power of a school district to levy taxes under art. XI, § 12 (now art. XIII, § 24) after art. IX, § 6 (now art. XIII, § 21) was added to the Const.].) However, neither the parties nor amici have seen fit to raise or discuss this issue in their briefs. Indeed, Building Industry, in response to our postargument inquiry, has conceded that factors are present "which indicate that school districts might be considered 'special districts' for purposes of Article XIII A." In view of such concession and lack of dispute, as well as our resolution of the case on other grounds, we do not reach or further discuss this issue.

[12] It appears that the passage of this statutory scheme resulted in the abandonment of an earlier legal assault on the type of special school taxes at issue here. On April 8, 1980, two-thirds of the voters of the Chino Unified School District approved a proposition to authorize the governing board of the district to levy a special tax against applicants for final building permits issued in the district. Litigation was commenced which raised the issue of the authority of the district to impose such a tax without the approval of the Legislature. However, we are advised that the action was dismissed after section 50075 was amended on July 20, 1980, to apply to "districts" as well as cities and counties.

In what is most significant to the issues before us, the measure expressed the electorate's view as to whether article XIII A, section 4, in and of itself, could be relied upon as a source of taxing authority. Section 53727 provides in pertinent part, "(a) Neither this Article, *nor Article XIII A* of the California Constitution, nor Article 3.5 of Division 1 of Title 5 of the Government Code (commencing with Section 50075) *shall be construed to authorize any* local government or *district to impose any general or special tax* which it is not otherwise authorized to impose; . . ." (Italics added.) As we discuss in more detail below, this voter approved statutory enactment confirms that section 4 of article XIII A was not intended as a *grant* of a new taxing authority; moreover, this enactment specifically withdrew the enabling legislation contained in section 50075 et seq.[13]

In order to authorize, regulate and restrict the imposition and collection of development fees by school districts, the Legislature added section 53080 to the Government Code in 1986. (Stats. 1986, ch. 887, § 8, p. 3080; amended by Stats. 1986, ch. 888, § 6, p. 3090.) That section provides for the imposition by school districts of development fees but makes them subject to certain limitations.[14]

These limitations are set out in section 65995, which provides that the amount of any fee, charge, dedication, or other form of requirement levied under section 53080 *shall not exceed, in the case of residential development, one dollar and fifty cents ($1.50) per square foot of covered or enclosed space.*[15]

---

[13] We note in passing that a recent decision of the Court of Appeal for the Fourth District (*City of Westminster* v. *County of Orange* (1988) 204 Cal.App.3d 623 [251 Cal.Rptr. 511]) has concluded that a portion of Proposition 62 (i.e., Gov. Code, § 53727, subd. (b)) is unconstitutional. However, that decision has no effect upon our determination to recognize as valid the other portions of Proposition 62 (i.e., Gov. Code, §§ 53720, subds. (a) and (b), 53721 and 53727, subd. (a)) which are relevant to the issues before us. (*People* v. *McCaughan* (1957) 49 Cal.2d 409, 416-417 [317 P.2d 974].)

[14] Section 53080, subdivision (a), provides:

"(a) The governing board of any school district is authorized to levy a fee, charge, dedication, or other form of requirement against any development project, as defined in Section 65928, within the boundaries of the district, for the purpose of funding the construction or reconstruction of school facilities, subject to any limitations set forth in Chapter 4.9 (commencing with Section 65995) of Division 1 of Title 7. This fee, charge, dedication, or other form of requirement may be applied only to new commercial and industrial construction, and, as to residential development, to new construction, and other construction to the extent of the resulting increase in habitable area."

[15] Section 65995 also provides that the limitation on the amount levied "shall be annually increased according to the adjustment for inflation set forth in the statewide cost index for class B construction, as determined by the State Allocation Board at its January meeting." (§ 65995, subd. (b) (3).) Subdivision (d) of section 65995 states: "The Legislature finds and declares that the subject of the financing of school facilities with development fees is a matter of statewide concern. For this reason the Legislature hereby occupies the subject matter of

Following the passage of Proposition 62, no enabling legislation existed for school districts to impose special taxes under article XIII A, section 4. Therefore, the Legislature added section 50079 to the Government Code. (Stats. 1987, ch. 100, § 1, No. 2 Deering's Adv. Legis. Service, p. 398.) That section became effective on July 2, 1987, just one month *after* the exactions challenged here were approved by the school districts' voters. It specifically authorized school districts to impose "qualified special taxes," but defined that term so as to require any such imposition to be made in a *uniform* manner.[16]

Finally, in 1987, as an expression of its concern about the voters' approval of the subject exactions and the importance which it attaches to this litigation, the Legislature enacted Education Code section 43060. (Stats. 1987, ch. 1187, § 3, No. 4 Deering's Adv. Legis. Service, pp. 4339-4340.) That section became effective September 26, 1987, just three months after the instant action was filed. It is directed specifically and solely at this action and provides, inter alia, that this case be given priority hearing and trial dates, both at the trial level and on appeal, "to the end that the action shall be quickly heard and determined." (Ed. Code, § 43060, subd. (a).)[17]

With this extensive, and sometimes confusing, background of legislative activity in mind, we now turn to a consideration of the critical issues which are dispositive of this appeal.

---

mandatory development fees and other development requirements for school facilities finance to the exclusion of all local measures on the subject."

[16] Section 50079 provides: "(a) Subject to Section 4 of Article XIII A of the California Constitution, any school district may impose qualified special taxes upon the district pursuant to the procedures established in Article 3.5 (commencing with Section 50075) and any other applicable procedures provided by law. [¶] (b) As used in this section, 'qualified special taxes' means special taxes which apply *uniformly to all taxpayers or all real property within the school district,* except that 'qualified special taxes' may include special taxes which provide for an exemption from those taxes for taxpayers 65 years of age or older. [¶] 'Qualified special taxes' do not include special taxes imposed on a particular class of property or taxpayers." (Italics added.)

While this section is proper authority for the imposition of special taxes by school districts, it cannot constitute a post-vote ratification of the exactions here at issue. Leaving aside the issue of whether such legislative ratification is possible, the taxes imposed by the school districts do not, as we point out below, satisfy the requirements of "qualified special taxes" set out in section 50079.

[17] Education Code section 43060 was enacted as part of Senate Bill No. 1377, which also included new Education Code section 43040.5. Section 43040.5 added the school districts to the special tax collection program created in 1980 by the Legislature in reaction to the passage of the special tax proposition by the voters of the Chino Unified School District. (See fn. 12, *ante.*)

## ISSUES ON APPEAL

There are four novel issues presented for resolution by this appeal: 1. Whether article XIII A, section 4 is a self-executing grant of taxing authority, so that enabling legislation for the imposition of a special tax would not be required;

2. Whether the exactions approved by voters in each of the school districts are special taxes within the meaning of article XIII A, section 4;

3. Whether the exactions at issue here were imposed "on the district" within the meaning of article XIII A, section 4; and

4. Whether such exactions, if not valid as special taxes, can be sustained as development fees.[18]

## DISCUSSION

1. *Article XIII A, Section 4, Is Not a Grant of a New Taxing Authority and the Special Taxes Imposed Here Are Invalid for Lack of Enabling Legislation*

 a. *The Determination of the Meaning and Intent of Article XIII A, Section 4*

We begin our analysis of article XIII A, section 4 by looking at the general scheme for legislative and taxing power in California. ■ "[A] written constitution is intended as and is the mere framework according to whose general outlines specific legislation must be framed and modeled, and is therefore, as stated and as is essentially true, necessarily couched in general terms or language, . . ." (*Stephens v. Chambers* (1917) 34 Cal.App. 660, 663 [168 P. 595].) ■ "Unlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature. [Citations.] Two important consequences flow from this fact. First, the entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers which are not expressly or by necessary implication denied to it

---

[18] In view of our determination that the exactions approved by the voters of the school districts are invalid, however characterized, there is no need to reach or discuss the broader constitutional issues raised by the parties and amici, including whether imposition of the exactions constituted (1) a denial of equal protection of the laws, (2) an unlawful taking of property without just compensation or (3) an interference with the right of travel.

by the Constitution. [Citations.] In other words, 'we do not look to the Constitution to determine whether the legislature is authorized to do an act, but only to see if it is prohibited.' (*Fitts* v. *Superior Court* (1936) 6 Cal.2d 230, 234 . . . .) [¶] Secondly, all intendments favor the exercise of the Legislature's plenary authority: 'If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. . . .' (*Collins* v. *Riley* (1944) 24 Cal.2d 912, 916 . . . .)" (*Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161].) This broad legislative power includes the field of taxation.

■ "Generally the Legislature is supreme in the field of taxation, and the provisions on taxation in the state Constitution are a limitation on the power of the Legislature rather than a grant to it. [Citations.] Its power in the field of taxation is limited only by constitutional restrictions. [Citations.]" *Delaney* v. *Lowery* (1944) 25 Cal.2d 561, 568 [154 P.2d 674]; accord *First City Bank* v. *Franchise Tax Bd.* (1977) 70 Cal.App.3d 444, 455 [139 Cal.Rptr. 12].) "In other words, the Legislature's authority to impose taxes and regulate the collection thereof exists unless it has been *expressly* eliminated by the Constitution. [Citation.]" (*Armstrong* v. *County of San Mateo* (1983) 146 Cal.App.3d 597, 624 [194 Cal.Rptr. 294]; accord *Hibernia Bank* v. *State Bd. of Equalization* (1985) 166 Cal.App.3d 393, 400 [212 Cal.Rptr. 556].)

As already noted, California's 1978 voter information pamphlet informed its citizens that the Legislative Counsel was of the opinion that existing constitutional provisions would prevent new special taxes unless the Legislature specifically approved placing such proposed taxes before the voters for their approval. The reference to the existing constitutional provisions most likely refers to article XIII, section 24 (formerly art. XI, § 12) which was added to the Constitution in November 1974 and which states in pertinent part: "The Legislature may not impose taxes for local purposes *but may authorize local governments to impose them.*" (Italics added.)

■ It has long been held that section 24 does not of itself vest a local governing body with inherent taxing power. The power to tax comes from the Legislature through its enactment of general laws which enable the local governing body to collect the taxes specified in those general laws. (*Hughes* v. *Ewing* (1892) 93 Cal. 414, 418 [28 P. 1067]; *Myers* v. *City Council of Pismo Beach* (1966) 241 Cal.App.2d 237, 240-241 [50 Cal.Rptr. 402]; Peppin, *Municipal Home Rule in California: IV* (1946) 34 Cal.L.Rev. 644, 667-668 (hereafter *Municipal Home Rule*).) Thus the history of this state, with respect to taxation by local governing bodies, is that each such tax must be

**228**

authorized by a specific general law. An exception, not relevant here, exists with respect to chartered cities and counties. (*In re Gritton* (1956) 46 Cal.2d 856, 858-859 [300 P.2d 7]; *Myers, supra,* at p.240; *Municipal Home Rule, supra,* at p. 668.)

 The school districts argue that article XIII A, section 4 was intended as a departure from the history applicable to article XIII, section 24. They insist section 4 does not require "enabling" legislation but rather is self-executing; that is, its very language empowers local governing bodies to tax. Building Industry argues the opposite.

Thus, our initial inquiry is to determine whether the provision in article XIII A, section 4, which states that cities, counties and special districts *may impose special taxes,* is (1) simply a preface to the imposition of a supermajority restriction on such special taxes as may be first legislatively authorized or (2) an expression of the electorate's intent that in reforming its tax circumstances it took a certain type of local taxation into its own hands and away from the Legislature where it has traditionally reposed. Simply put, does section 4 merely impose a further restriction on legislatively approved taxes or does it grant inherent taxing power?

The answer is less clear than the school districts' reading of section 4 would suggest. It seems beyond argument that section 4 is ambiguous in several respects. As the Supreme Court noted in *Los Angeles County Transportation Com.* v. *Richmond, supra,* 31 Cal.3d 197, "This court recognized in *Amador* that the language of article XIII A is 'imprecise and ambiguous' in a number of particulars. Nowhere is this imprecision more evident than in the language of section 4. The first aspect of the provision which strikes a reader is that its terms are permissive rather than restrictive. That is, it authorizes local entities to adopt 'special taxes' on the vote of two-thirds of the electorate, rather than prohibiting them from doing so without the concurrence of that number of voters. Nevertheless, we held in *Amador* that section 4 is actually a limitation on the imposition of 'special taxes' because it requires a two-thirds vote for their approval. [Citation.] [¶] The ambiguity in section 4 extends also to the terms 'special taxes' and 'special districts.'" (*Id.,* at p. 201, fn. omitted.)[19]

In addition, the extrinsic evidence of the voter information pamphlet shows that section 4 has the latent ambiguity presented by the conflicting positions of the parties. (*Mosk* v. *Superior Court* (1979) 25 Cal.3d 474, 495, fn. 18 [159 Cal.Rptr. 494, 601 P.2d 1030].) Where such ambiguities exist,

---

[19]*See footnote 11, ante.*

several recognized rules of construction can be applied to resolve them. (*Stanton* v. *Panish* (1980) 28 Cal.3d 107, 115 [167 Cal.Rptr. 584, 615 P.2d 1372].)

### (1) *Harmonization of Separate Provisions*

■ First, constitutional provisions must not be examined in isolation but rather in view of other provisions in the Constitution which bear on the same subject (*Fields* v. *Eu* (1976) 18 Cal.3d 322, 328 [134 Cal.Rptr. 367, 556 P.2d 729]) so that the respective provisions can be harmonized (1) to avoid conflict (*Stanton* v. *Panish, supra,* 28 Cal.3d at p. 115), (2) to give effect to the scheme as a whole (*Fields* v. *Eu, supra,* at p. 328) and (3) to avoid an implied repeal or partial repeal of a constitutional provision (*Board of Supervisors* v. *Lonergan* (1980) 27 Cal.3d 855, 868-869 [167 Cal.Rptr. 820, 616 P.2d 802]).

The subject at hand is taxation; thus, article XIII, entitled "Taxation" must be examined in conjunction with article XIII A, which is entitled "Tax Limitation." ■ To conclude that section 4 is self-executing would result in an unnecessary and destructive conflict with the established procedure (under art. XIII, § 24) that local governing bodies look to the Legislature for permission to tax.

### (2) *Avoidance of Implied Partial Repeal*

Such a construction of section 4 would also result in an implied partial repeal of article XIII, section 24 insofar as the local tax is a "special tax." This is a result to be avoided whenever possible. ■ "So strong is the presumption against implied repeals that when a new enactment conflicts with an existing provision, 'In order for the second law to repeal or supersede the first, the former must constitute a revision of the entire subject, so that the court may say that it was intended to be a substitute for the first.' [*Penziner* v. *West American Finance Co.* (1937) 10 Cal.2d 160, 176]" (*Board of Supervisors* v. *Lonergan, supra,* 27 Cal.3d at p. 868.) "The presumption is against repeals by implication, especially where the prior act has been generally understood and acted upon. To overcome the presumption the two acts must be irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation. The courts are bound, if possible, to maintain the integrity of both statutes if the two may stand together." (*Penziner* v. *West American Finance Co.* (1937) 10 Cal.2d 160, 176 [74 P.2d 252].)

■ Here, we cannot say that section 4 of article XIII A (or even article XIII A as a whole) was intended to be a revision of the entire subject of

taxation and intended to partially replace section 24 of article XIII. As noted above, section 24 has long been held to require enabling legislation for local taxation, and has thus been "generally understood and acted upon." (*Ibid.*)

Further, there is no need to find an implied partial repeal of section 24 because article XIII A, section 4 is not irreconcilable with section 24. The two sections can have concurrent operation by construing section 4 as merely a restriction on a local governing body's ability to impose local taxes (by requiring a two-thirds approval of the taxes). Such a construction was placed upon section 4 in *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at p. 220 and reiterated in *Los Angeles County Transportation Com.* v. *Richmond, supra,* 31 Cal.3d at p. 201.

### (3) *Intent of the Electorate*

■ "Where a provision in the Constitution is ambiguous, a court must ordinarily adopt that interpretation which carries out the intent and objective of . . . the people by whose vote it was adopted. [Citations.]" (*Mosk* v. *Superior Court, supra,* 25 Cal.3d at p. 495; accord *Board of Supervisors* v. *Lonergan, supra,* 27 Cal.3d at p. 863.) To ascertain this intent and objective, a court may consider the materials presented to the voters in the ballot pamphlet. (*City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47, 52 [184 Cal.Rptr. 713, 648 P.2d 935]; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at pp. 245-246.)

■ In reviewing the relevant 1978 voter pamphlet, it can easily be inferred from the information given there (*ante,* at pp. 222-223) that voters believed they were authorizing special taxes which had to pass through two steps—first, approval by the Legislature through enabling legislation[20] and second, approval by two-thirds of the voters in the city, county or special district. Further, this inference is in keeping with the underlying purpose of the initiative (i.e., effective property tax relief) as described by our Supreme Court in *Amador.* (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at p. 231.)[21] Thus, to maximize the clear

---

[20]With respect to this first step it is noteworthy that the Supreme Court has referred to Government Code sections 50075 to 50077 as being "expressly intended as enabling legislation to fulfill the grant of power in section 4" without any indication that such legislation was not necessary because section 4 is self-executing. (*Los Angeles County Transportation Com.* v. *Richmond, supra,* 31 Cal.3d at p. 207, fn. omitted.)

[21]Although sections 3 and 4 of article XIII A do not pertain solely to property taxation, they work to prevent the property tax relief given by sections 1 and 2 from being diluted by other types of state and local taxes. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at p. 231.)

intent of article XIII A requires a conclusion that enabling legislation is required before a special district can enact a special tax under article XIII A, section 4.

### (4) *Primacy of Legislative Interpretation and Construction*

 Building Industry correctly argues that in determining whether article XIII A, section 4 is self-executing we should also apply the rule of construction which states that ambiguities in an enactment may be resolved by referring to the contemporaneous construction given to the enactment by the Legislature or by the administrative agency charged with implementing the enactment. (*Los Angeles County Transportation Com.* v. *Richmond, supra,* 31 Cal.3d at pp. 202-203; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at p. 245.) "[W]here a constitutional provision may well have either of two meanings, it is a fundamental rule of constitutional construction that, if the legislature has by statute adopted one, its action in this respect is well nigh, if not completely, controlling." (*San Francisco* v. *Industrial Acc. Com.* (1920) 183 Cal. 273, 279 [191 P. 26]; accord *Armstrong* v. *County of San Mateo, supra,* 146 Cal.App.3d at p. 623.)

 That rule has been expressly applied to article XIII A, section 4 by the *Richmond* court. As noted above, the court specifically stated that sections 50075 to 50077 were intended by the Legislature as enabling legislation for section 4. (*Los Angeles County Transportation Com.* v. *Richmond, supra,* 31 Cal.3d at p. 207.) A review of the legislative history for these sections bears this out.

Sections 50075 to 50077 were proposed as Senate Bill No. 785, in the 1979-1980 Regular Session of the Legislature. The history of Senate Bill No. 785 shows that the legislators were aware of the controversy over self-execution. A report from the Assembly Committee on Local Government states in part: "There are two views on the special tax authority granted to local governments by Section 4 of Article XIII A. According to the first view, Section 4 is an independent grant of authority under which any city, county or special district may impose a special tax upon a 2/3 vote of the electorate regardless of whether the local government has specific statutory authority to impose such a tax. If this argument is accepted . . . the intent language of [proposed § 50075] is superfluous and unnecessary. . . . [¶] The second view is that a local government may not impose any special tax pursuant to Section 4 of Article XIII A unless the local government is specifically authorized by statute to impose such a tax." It is clear that the Legislature accepted the latter view. For example, the Third Reading Anal-

ysis of Senate Bill No. 785 prepared by the Assembly Office of Research states in part: "This bill declares legislative intent to provide all cities and counties[22] with the authority to impose special taxes. The bill: [¶] 1) . . . [¶] 2) Authorizes the legislative body of a city or county to levy a special tax. . . ." The staff analysis of Senate Bill No. 785 prepared by the Senate Committee on Local Government states in part: "There is currently no provision in existing law which outlines a procedure for a city to levy a special tax under the provisions of Proposition 13."

Other enactments by the Legislature similarly confirm its understanding and belief that such enabling legislation is required. For example, Education Code section 85100 demonstrates the Legislature's belief in its right to place limitations on special taxes imposed under article XIII A, section 4. The enactment of Health and Safety Code section 2871.8 in 1984, six years after the passage of article XIII A, demonstrates the Legislature's consistent position that section 4 did not constitute a grant of inherent taxing power.[23] Perhaps most significant to this case is section 50079 (eff. July 2, 1987) which grants specific post-Proposition 62 authority to school districts to impose "qualified special taxes" (i.e., taxes imposed and applied *uniformly* on all persons or property within the district, a characteristic which the subject exactions do not possess).

Finally, the initiative measure enacted by the voters subsequent to the passage of article XIII A further reinforces our conclusion. (*Mills* v. *County of Trinity* (1980) 108 Cal.App.3d 656, 663 [166 Cal.Rptr. 674].) As described earlier, Proposition 62, approved by the voters in 1986, added to the Government Code section 53727 which provides that article XIII A shall not be "construed to authorize any local government or district to impose any general or special tax which it is not otherwise authorized to impose . . . ." Thus the voters likewise voiced their intent and understanding that article XIII A not be construed as a grant of taxing authority.

b. *The Consequences of Concluding That Section 4 Is Not Self-executing*

■ From our conclusion that section 4 of article XIII A requires enabling legislation, it follows that exactions sought to be levied under

---

[22] Just a few months later, the Legislature enacted an amendment to section 50075 (eff. July 20, 1980) to specifically refer to "districts" as well as to cities and counties.

[23] Additional examples of the Legislature's continuing affirmation of its belief and understanding as to the necessity of prior enabling legislative authority for imposition of special taxes by local governing bodies include section 37100.5 (general law cities), section 53314.3 (Mello-Roos community facilities districts), section 53382 (community rehabilitation districts), section 53717 (eff. Sept. 26, 1988, public library facilities), section 53730.01 (eff. Jan. 1, 1989, hospital districts), and section 53978 (local agency fire and police protection).

section 4 can be valid as special taxes *only* if there was such enabling legislation in effect when they were approved by the voters. In June of 1987, when the voters approved the instant exactions, there was no such statutory authority because Proposition 62 (specifically §§ 53726 and 53727) had, seven months earlier, negated the original enabling legislation (found in §§ 50075-50077).[24] Section 53727 states that, with the exception of certain taxes not relevant here, section 50075 et seq., shall not be construed to authorize any local government or district to impose special taxes which it was not otherwise authorized to impose. Thus, the subject exactions are invalid because the required enabling legislation did not exist.

*2. The Exactions Approved by the Voters of the School Districts Are Not "Special Taxes" Within the Meaning of Article XIII A, Section 4.*

This case presents a novel but transparent attempt by the school districts to circumvent the dollar limitations found in section 65995. Although authorized by section 53080 "to levy a fee, charge, dedication, or other form of requirement against" development projects for the purpose of funding construction of school facilities, section 65995 limits the amount of those fees. School districts were apparently concerned that the amount which section 53080 allows them to impose would not be sufficient to meet the reasonable costs of providing school facilities for the anticipated increase in the school population which would be generated by new housing.[25]

It is clear to this court that as a means of avoiding the section 65995 limitations, school districts decided to adopt the subject exactions. Under the guise of the term "special tax," school districts sent to their voters a measure which would impose what are, in actuality, development fees. However, such fees are normally enacted by local governing bodies themselves, not by voters. (See, e.g. *Candid Enterprises, Inc.* v. *Grossmont Union High School Dist.* (1985) 39 Cal.3d 878 [218 Cal.Rptr. 303, 705 P.2d 876] [school-impact fees imposed pursuant to a county land-use policy]; *Russ Bldg. Partnership* v. *City and County of San Francisco* (1987) 199 Cal.App.3d 1496 [246 Cal.Rptr. 21] [transit-impact fees imposed by city and county]; *Terminal Plaza Corp.* v. *City and County of San Francisco*

[24] Section 50079 did not become effective until July 2, 1987, 30 days *after* the voters in the school districts approved the subject exactions. However, such post-vote approval by the Legislature is of no assistance to the school districts in this case. (See fn. 16, *ante*.)

[25] As we note below, studies commissioned by the school districts confirm that the projected costs of anticipated future facilities would exceed the applicable statutory limitation on the imposition of development fees. Thus, the school districts passed the "special tax" resolutions as a solution to such shortfall.

(1986) 177 Cal.App.3d 892 [223 Cal.Rptr. 379] [requirement of one-for-one replacement of housing units or fee in lieu thereof imposed by city and county]; *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist.* (1985) 165 Cal.App.3d 227 [211 Cal.Rptr. 567] [facilities fees for water hook-up imposed by water district]; *Trent Meredith, Inc.* v. *City of Oxnard* (1981) 114 Cal.App.3d 317 [170 Cal.Rptr. 685] [school-impact fees or dedication of land in lieu thereof imposed by city]; *Mills* v. *County of Trinity, supra,* 108 Cal.App.3d 656 [land-use regulatory activities fees imposed by county].)

■ Development fees are an exercise of the local police power granted to cities and counties by article XI, section 7 of the California Constitution. (*Russ Bldg. Partnership* v. *City and County of San Francisco, supra,* 199 Cal.App.3d at p. 1504; *Trent Meridith, Inc.* v. *City of Oxnard, supra,* 114 Cal.App.3d at p. 325; *Mills* v. *County of Trinity, supra,* 108 Cal.App.3d at p. 662.) While general law cities and counties receive their taxing power from the Legislature under article XIII, section 24, they can impose development fees pursuant to their police power without the necessity of authority from the Legislature. (*Mills, supra,* at p. 662.) ■ However, the school districts have no such police power to support the imposition of development fees. Their authority for said fees comes *solely* from section 53080 *and is subject to the section 65995 financial limitations.*

The consequence of the school districts' action has been that the normal "developers vs. local governing bodies" roles have been reversed. Whereas it is generally the developers who insist that a challenged exaction is a special tax and not a development fee (for the purpose of having it voided because it was not approved by two-thirds of the voters [see, e.g., *Russ Bldg. Partnership* v. *City and County of San Francisco, supra,* 199 Cal.App.3d 1496; *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist., supra,* 165 Cal.App.3d 227; *Trent Meridith, Inc.* v. *City of Oxnard, supra,* 114 Cal.App.3d 317]), here it is the school districts which are insisting that the exactions are special taxes and not development fees, for the purpose of avoiding the statutory limitations on such fees. ■ Whether the exactions are development fees or special taxes is an issue of law (*Russ Bldg. Partnership, supra,* at p. 1504) which we here resolve.

■ Although school districts assert that (1) we should accept at face value their claim that the exactions are special taxes, not development fees, and (2) Building Industry should have the burden of demonstrating otherwise, logic and fairness compel just the opposite conclusion on both points. The challenged exactions have the appearance of development fees and should be considered as such unless school districts can establish that they

are special taxes. The record demonstrates that they have not met that burden.

■ Our Supreme Court defined the term "special taxes," as used in article XIII A, section 4, to mean "taxes which are levied for a specific purpose rather than . . . a levy placed in the general fund to be utilized for general governmental purposes." (*City and County of San Francisco* v. *Farrell, supra,* 32 Cal.3d at p. 57.) ■ School districts argue that the exactions at issue here are to be used for a specific purpose and therefore have the incidents of a special tax. However, as the court in *Russ* noted, while a challenged exaction may be sought for a special purpose, "the crucial inquiry is whether [it] is a tax at all. The definition in *Farrell* makes the distinction between types of taxes only." (*Russ Bldg. Partnership* v. *City and County of San Francisco, supra,* 199 Cal.App.3d at p. 1505.)

The type of exactions at issue here have traditionally been denominated "development fees." ■ "Typically, a development fee is an exaction imposed as a precondition for the privilege of developing the land. Such fees are commonly imposed on developers by local governments in order to lessen the adverse impact of increased population generated by the development. (See *Candid Enterprises, Inc.* v. *Grossmont Union High School Dist.* (1985) 39 Cal.3d 878 . . . [school-impact fees]; *Associated Home Builders etc., Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633 . . . [dedication of land for park space or fee in lieu thereof].) This is one of the most common subjects of local police power regulations. (See *Trent Meridith, Inc.* v. *City of Oxnard* (1981) 114 Cal.App.3d 317, 325 . . . .) ' "The position of the public entity is that this arrangement is only fair. The developer has created a new, and cumulatively overwhelming, burden on local government facilities, and therefore he should offset the additional responsibilities required of the public agency by the dedication of land, construction of improvements, or payment of fees, all needed to provide improvements and services required by the new development. . . ." ' (*Ibid.*)" (*Russ Bldg. Partnership* v. *City and County of San Francisco, supra,* 199 Cal.App.3d at p. 1504.)[26]

The court in *Russ* approved of a San Francisco ordinance which charged a transit fee on newly developed downtown office space so as to provide for the increased use of the municipal railway system. School-impact develop-

---

[26] Such fees are easily distinguished from the special taxes specifically authorized by statutory provisions such as the Mello-Roos Community Facilities Act of 1982 (§ 53311 et seq.). While under that statutory scheme the tax proceeds are to be used for certain specified facility development or services, the special taxes are compulsory and are imposed on all nonexempt property within the district with no requirement that they be apportioned on the basis of benefit to any property. (See §§ 53325.3, 53340.)

ment fees were approved of by the Supreme Court in *Candid Enterprises, Inc.* v. *Grossmont Union High School Dist., supra,* 39 Cal.3d 878, 885 and in *Builders Assn. of Santa Clara-Santa Cruz Counties* v. *Superior Court* (1974) 13 Cal.3d 225, 232, fn. 6 [118 Cal.Rptr. 158, 529 P.2d 582].

In discussing development fees, the courts have noted certain differences between such fees and taxes. ■■■ Whereas taxes are compulsory in nature, development fees are imposed only if a developer elects to develop. (*Russ Bldg. Partnership* v. *City and County of San Francisco, supra,* 199 Cal.App.3d at p. 1505; *Terminal Plaza Corp.* v. *City and County of San Francisco, supra,* 177 Cal.App.3d at p. 907.) Furthermore, a special tax "levies a fee to replace revenue for services which were affected by the reduction [in taxes] caused by article XIII A. [Citation.] In contrast, [a development fee] is not intended to replace revenues lost as a result of article XIII A. It is triggered by the voluntary decision of the developer to [proceed with his development] and is directly tied to the increase in [residents, students, riders, etc.] that this construction will possibly generate." (*Russ, supra,* at p. 1505.)

■■■ While it is true that under the provisions of section 50076 a development fee may be treated as a special tax, that will only occur when one or both of the conditions set out in that section are found to exist, that is, (1) the fee exceeds the reasonable cost of providing the service or the regulatory activity for which it is charged or (2) the fee is levied for general revenue purposes. (§ 50076; *Pennell* v. *City of San Jose* (1986) 42 Cal.3d 365, 374-375 [228 Cal.Rptr. 726, 721 P.2d 1111]; *Russ Bldg. Partnership* v. *City and County of San Francisco, supra,* 199 Cal.App.3d at p. 1505; *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist., supra,* 165 Cal.App.3d at p. 234.) Neither circumstance exists here. The school districts acknowledge that their exactions do not exceed the costs of the contemplated school facilities. It is also clear that the exactions were not levied for general revenue purposes but rather for a specific school revenue purpose—construction of facilities. Allowing the school districts to characterize these development fees as "special taxes" would have the effect of permitting them to avoid prescribed statutory limitations by judicious choice of a label. This is not permissible. (Cf. *City of Atascadero* v. *Daly* (1982) 135 Cal.App.3d 466, 470-471 [185 Cal.Rptr. 228].)

School districts argue that their denomination of the development fees as special taxes is supported by language of the Supreme Court in *Candid Enterprises, Inc.* v. *Grossmont Union High School Dist., supra,* 39 Cal.3d 878. There the court noted that although school districts are limited in the amount of funding which they can obtain from property taxes, ". . . Propo-

sition 13 authorizes the imposition of 'special taxes' by a vote of two-thirds of the electorate." (*Id.,* at p. 882.) However, the court went on to say "such special taxes have rarely been imposed, remain novel, and as consequence [*sic*] are evidently not perceived as a practical method of school facility financing—*especially in view of the need for a two-thirds vote of the electorate to approve them.* [Citation.]" (*Ibid.,* italics added.) The obvious intent of the underscored words is that voters are often not willing to impose taxes *on themselves.* Here, in an unsurprising result, the voters gladly imposed "taxes" which the developers alone would have to pay. This was directly at odds with the purpose and intent of section 4's supermajority requirement.

We therefore conclude that the subject exactions cannot properly be characterized as special taxes within the meaning of article XIII A, section 4. They instead have all the characteristics of, and must be considered to be, development fees.

### 3. *The Exactions Here at Issue Were Not Imposed "On the District" Within the Meaning of Article XIII A, Section 4*

Section 4 provides that the special taxes imposed by cities, counties and special districts must be imposed "on such district." ▪▪▪ For the reasons discussed below, we interpret this directive language to preclude taxes which the electorate impose on others and not directly or indirectly on themselves (allowing, of course, for reasonable tax exemptions, such as the one found in section 50079, and for reasonable rate differentials). School districts disagree with our interpretation. They argue that the phrase "on such district" merely limits the area in which special taxes can be imposed to the area encompassed by the boundaries of the city, county or special district.

▪▪▪ "Where the language of a statute is susceptible of two constructions, one of which, in application, will render it reasonable, fair and harmonious with its manifest purpose, and another which would be productive of absurd consequences, the former construction will be adopted. [Citation.]" (*Uhl* v. *Badaracco* (1926) 199 Cal. 270, 284 [248 P. 917]; accord *Wilson* v. *Board of Retirement* (1959) 176 Cal.App.2d 320, 324 [1 Cal.Rptr. 373].) ▪▪▪ As noted above, the purpose of section 4 is to *restrict* special taxes to those which can be obtained by a supermajority vote. (*City and County of San Francisco* v. *Farrell, supra,* 32 Cal.3d at p. 53; *Los Angeles County Transportation Com.* v. *Richmond, supra,* 31 Cal.3d at p. 201; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at p. 220.) This will help insure that the property tax relief given in sections 1 and 2 of article XIII A will not be thwarted by new taxes

imposed by a simple majority of the people. (*Huntington Park Redevelopment Agency* v. *Martin* (1985) 38 Cal.3d 100, 105 [211 Cal.Rptr. 133, 695 P.2d 220].)

To adopt the school districts' interpretation of the phrase "on such district" would allow the absurd consequence effected by the voters in the instant case—overwhelming passage of a "tax" which they themselves do not have to pay, either directly or indirectly.[27] The constitutionally imposed difficulty of a two-thirds vote would be rendered meaningless. In contrast, requiring the tax to be imposed directly or indirectly on the electorate to whom the tax was submitted will give effect to the limitation on new taxes which the supermajority requirement seeks to insure.

As before, we can look to enactments by the Legislature as a guide to the meaning of the ambiguous phrase "on such district." For example, a review of subdivision (a) of section 53978 shows that the Legislature recognizes that the requirement for a two-thirds vote means a vote to be rendered by those who will directly or indirectly pay the proposed tax. Section 53978 provides that local agencies which provide fire and police protection services may propose special taxes for adoption by two-thirds of the voters in the district; or if the legislative body of the agency desires, it may establish zones or areas within the agency and restrict the levy of the special tax to those zones or areas, in which case the vote shall be by the voters of the affected area or zone.

Language in two Supreme Court decisions further supports our conclusion on this issue. As already noted, the Court observed in *Candid Enterprises, Inc.* v. *Grossmont Union High School Dist., supra,* 39 Cal.3d 878, 882, that article XIII A special taxes have rarely been imposed because of the need for a two-thirds vote of the electorate. The implication in this observation is that the two-thirds vote would have to be achieved through voters *who will pay the tax themselves.* In *City and County of San Francisco* v. *Farrell, supra,* 32 Cal.3d 47, the court observed that the two-thirds requirement in section 4 "was imposed by a simple majority of the voters throughout the state upon a local entity to prohibit a majority (but less than two-thirds) of the voters of that entity *from taxing themselves* for programs or services which would benefit largely local residents." (*Id.,* at p. 52, italics added.)

Thus, even if we were to agree with the school districts that the challenged exactions are special taxes which did not require prior enabling

---

[27] See footnote 4, *ante.*

authority from the Legislature, the imposition by the school districts of exactions which were not to be paid directly or indirectly by the electorate to whom they were submitted did not satisfy the requirement of an imposition "on such district."

### 4. The Exactions Approved by the Voters of the School Districts Can Not Be Sustained as Development Fees

"In the early 1970's [sic], because of resistance to increasing real property taxes, localities throughout the state began to experience greater difficulty in obtaining voter approval of bond issues to finance school facility construction and maintenance. As a result, a number of communities chose to impose on developers school-impact fees . . . in order to make new development cover the costs of school facilities attributable to it. [Citation.]" (Candid Enterprises, Inc. v. Grossmont Union High School Dist., supra, 39 Cal.3d 878, 881-882.) In 1986, the Legislature responded to this growing trend by enacting sections 53080 and 65995 which authorize and place a cap on the amount of development fees which can be imposed by a school district for the purpose of funding construction or reconstruction of school facilities.

In anticipation of imposing such development fees under sections 53080 and 65995, the school districts commissioned development fee implementation studies in the fall of 1986. The districts sought to determine the potential future impact of new residential, commercial and industrial development in the districts, in terms of the need for new school facilities to serve the increased enrollment caused by this development. They also sought to determine to what degree the development fees would mitigate that impact.[28] The studies reflected that for the years 1986 through 2000, the amount of money provided by residential, commercial and industrial development fees would be far below the amount needed by the school districts for new school facilities. In view of the shortfall caused by the dollar limitations in section 65995, the school districts passed resolutions to levy not only the development fees but also the "special taxes" challenged here.

As a result, the total exactions imposed by the school districts substantially exceed the statutory dollar limitation on development fees allowed by subdivision (b) of section 65995. ■■■ If, as we hold, these exactions must

---

[28] The studies found that the average cost of new school facilities for the districts is approximately $3.59 per square foot of residential development and that the $1.50 per square foot allowed by section 65995 represents 41.8% of that cost. The studies also found that the school facilities cost per square foot of commercial and industrial development "far exceeds the maximum fee allowed by [§ 65995]." (See fns. 3 and 6, ante.)

be viewed as development fees, then they are clearly preempted by state law because they conflict with sections 53080 and 65995, subdivisions (b) and (d) by taking an amount in excess of the maximum provided for in those sections. (*Candid Enterprises, Inc.* v. *Grossmont Union High School Dist,* *supra,* 39 Cal.3d at p. 885.) The fact that a local measure preempted by the general law has the support of local voters is of no consequence.

## CONCLUSION

Thus, for each and all of the foregoing reasons, the subject exactions approved by the voters of the school districts on June 2, 1987, are invalid.

## DISPOSITION

The judgment of the trial court denying Building Industry's petition for a writ of mandate is reversed. Upon remand, the trial court is directed to grant such writ in accordance with the views expressed herein. Building Industry shall recover its costs on appeal.

Klein, P. J., and Arabian, J., concurred.

The petitions for a rehearing were denied December 29, 1988, and the opinion was modified to read as printed above. Respondents' petitions for review by the Supreme Court were denied February 16, 1989. Mosk, J., was of the opinion that the petitions should be granted.